# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ROBERT N. SULLIVAN,

        **Plaintiff,**

    **v.**                    **Civil Action 2:17-cv-1051**
                                  **Chief Judge Edmund A. Sargus, Jr.**
                                  **Magistrate Judge Jolson**

COMMISSIONER OF SOCIAL
SECURITY,

        **Defendant.**

### REPORT AND RECOMMENDATION

Plaintiff, Robert N. Sullivan, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his applications for Title II Social Security Disability Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI"). For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 13) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## I.    BACKGROUND

### A.  Prior Proceedings

Plaintiff filed applications for DIB and SSI on February 12, 2014, alleging disability beginning November 9, 2012. (Tr. 115, 126, PAGEID #: 156, 167). After Plaintiff's application was denied initially and on reconsideration (*see* Tr. 115–64, PAGEID #: 156–205), Plaintiff filed a Request for Hearing by an Administrative Law Judge (Tr. 200, PAGEID #: 241). Administrative Law Judge John M. Wood (the "ALJ") held a hearing on June 22, 2016. (Tr. 91–112, PAGEID #: 132–53). On July 27, 2016, the ALJ issued a decision finding that Plaintiff was not disabled as defined in the Social Security Act. (Tr. 8–21, PAGEID #: 49–62). The Appeals

Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, Tr. 1–4, PAGEID #: 42–45).

Plaintiff filed this case on December 5, 2017 (Doc. 3), and the Commissioner filed the administrative record on February 8, 2018 (Doc. 7). Plaintiff filed a Statement of Specific Errors (Doc. 13), the Commissioner responded (Doc. 14), and Plaintiff filed a Reply (Doc. 15).

### B. Relevant Testimony at the Administrative Hearing

At the hearing, Plaintiff amended his alleged onset date to February 12, 2015. (Tr. 94, PAGEID #: 135). In her opening remarks, Plaintiff's attorney explained that Plaintiff had a history of diabetes and neuropathy in his lower extremities, but due to difficultly tolerating nerve testing, the testing was unable to be completed. (*Id.*). Plaintiff's attorney noted, however, that the testing summary stated "that the presenting history [was] consistent with small fiber sensory generalized peripheral neuropathy, and possibly meralgia paresthetica." (Tr. 94–95, PAGEID #: 135–36). Finally, Plaintiff's counsel explained that Plaintiff experienced problems with his knees, thoracic lumbar, cervical spine, hearing, and suffered from headaches. (Tr. 95, PAGEID #: 136).

Plaintiff testified that he was fifty-one years old, lived alone, and had completed high-school and a two-year vocational program. (Tr. 96, PAGEID #: 137). Although Plaintiff stated that he could drive, he testified that he does not go very far, and his girlfriend drove him to the hearing. (*Id.*). When asked by the ALJ why he can no longer work, Plaintiff responded as follows:

> Well, Your Honor, I just can't do it no more, my feet and stuff just kill me so bad, my hands draw up on me, and I just, my lower back hurts me, the arthritis and stuff it just comes and goes. I just can't do it no more like I used to . . . My feet hurts me awful bad, I've got diabetic nerve pains, and my hands will draw up

quite often.

(Tr. 97, PAGEID #: 138).   Plaintiff described his foot pain as "a cold burning [with] tingling sharp stabbing pains" and numbness.   (Tr. 101, PAGEID #: 142).   Plaintiff testified that his feet cause problems standing and walking.   (*Id.*).   Further, Plaintiff stated that his toenails "rot, they turn yellow, and they fall off, and they grow backwards on [his] toes."   (*Id.*).   In talking about his feet and toenails, Plaintiff explained that his doctor "put [him] on medication for three months and they didn't, nothing seemed to work," but it was not clear whether the medication was for his toenails or neuropathy.   (*Id.*).

In terms of other impairments, Plaintiff testified that his back hurts when he sits or stands for periods of time, but offered no definitive amount of time.   (Tr. 101–02, PAGEID #: 142–43). He testified that his right knee has "been bothering [him] for quite a while," and he experiences swelling and "sharp stabbing pains."   (Tr. 102, PAGEID #: 143).   Plaintiff stated that he received Cortisone injections in his knee that helped for about a month or two.   (Tr. 102–03, PAGEID #: 143–44).   Plaintiff also testified that he has some degeneration in his neck that causes chronic headaches.   (Tr. 103, PAGEID #: 144).   Plaintiff stated he had difficulty hearing, and although he had hearing aids, he "got so much feed with them" and they made the inside of his ears swell, that he stopped wearing them.   (Tr. 103–04, PAGEID #: 144–45).   Finally, Plaintiff explained that he was taking Lyrica but it made him "kind of like zombify[,]" which affected his ability to concentrate.   (Tr. 105, PAGEID #: 146).

Plaintiff stated he was able to take care of his needs on a daily basis, except that he could not do yard work.   (Tr. 98, PAGEID #: 139).   Plaintiff testified that he eats "a lot of microwave stuff," uses paper plates so he does not have to do dishes, sometimes does laundry, tries to sweep

the floor, and takes care of his dog. (Tr. 98–100, PAGEID #: 139–41). His girlfriend goes grocery shopping for him and helps him clean. (Tr. 98–99, PAGEID #: 139–40). Plaintiff testified that he seldom goes anywhere, but if he does leave the house, he goes to his mailbox or to his mom and dad's house. (Tr. 100, PAGEID #: 141).

Vocational Expert Robert Malik (the "VE") also testified at the hearing. (Tr. 106, PAGEID: # 147). The ALJ posed the following hypothetical to the VE:

> Q: . . . Assume the past work activity is the same as the Claimant's, the exertion capacity is limited to light work. No climbing of ladders, ropes, or scaffolds, other postural functions could be performed occasionally. He needs to avoid hazards, need to be able to alternate between a standing position and a seated position periodically during the course of the day, not necessarily at will, but as circumstances will allow, so by the end of the day as desired, one could sit or stand equally in the aggregate, manipulative functions performed frequently, and the need to avoid moderate exposure to noise, and also because of chronic headaches, a limitation of performance to simple and repetitive tasks involving little or no change in work routine. I assume the past work would be out, right?

> A: Correct.

> Q: For the other vocational factors, assume the hypothetical is of the Claimant's age, and education and work history. In your opinion would there be unskilled light jobs such a person could perform?

> A: Yes, sir. Unskilled jobs that would meet the hypothetical would include . . . a packager . . . a router . . . [and] an order caller[.]"

(Tr. 106–07, PAGEID #: 147–48). Plaintiff's attorney then questioned the VE:

> Q: In terms of the hypothetical the judge asked, with the jobs you listed and the sit/stand option, in your experience in those jobs, what kind of sitting is tolerated in those workplaces in terms of how many hours would they allow a person to sit in total throughout the work day before it would potentially become an issue?

> A: Well, actually in the packaging position that I listed, I adjusted the numbers to get to the jobs that are typically done in a seated position. The individual could stand to do them, so I made an adjustment there to take care of that. In the routing clerk, or the routing position, there again, the individual, just by the nature of the job sits and stands approximately half of the time, based upon what they're

sorting, and routing, and getting ready. Part of it is getting the paperwork at the desk ready, and soring certain items. The other part is standing and putting it – so, due to the nature of the job, based upon my experience, it happens already at about a 50/50. The order caller there again is a job that's typically done where the individual sits part of the time, gets it ready and then walks out and gives the order to the production floor. So, based upon my experience again, that one is approximately a 50/50 that the individual, it's just the nature of the job.

\*\*\*

Q: Okay. In terms of the router and the order caller position, you said that those were about 50/50. If an individual were only able to stand and walk about three hours of an eight-hour work day, would that affect the ability to maintain those jobs?

A: Some of them, it would reduce the numbers. I can't give you a good estimate on it.

(Tr. 109–10, PAGEID #: 150–51).

## C. Relevant Medical Background

On August 19, 2013, Plaintiff presented to Marietta Memorial Hospital due to headaches (Tr. 368, PAGEID #: 409). Plaintiff stated that "for the last month he ha[d] been having occipital headaches," and was taking Aleve for the pain. (Tr. 368, 370, PAGEID #: 409, 411). Plaintiff underwent a CT of his head that was deemed "unremarkable," and Plaintiff was discharged as stable. (Tr. 371, 381, PAGEID #: 412, 422).

Plaintiff followed-up with his primary care physician, Dr. Joy Chesnut, regarding his headaches on August 22, 2013. (Tr. 395, PAGEID #: 436). At that appointment, Plaintiff reported he was experiencing headaches every day and he was taking Aleve about four times per week. (Tr. 396, PAGEID #: 437). Dr. Chesnut's treatment notes indicate she believed the headaches may be secondary to Plaintiff's neck issues.

Plaintiff saw Dr. Chesnut again on September 25, 2013, and reported that he was still

experiencing headaches. (Tr. 400, PAGEID #: 441). Plaintiff returned to Dr. Chesnut on October 10, 2013. (Tr. 405, PAGEID #: 446). Treatment notes state that "things are going good," and although Plaintiff still has headaches, they are "not as bad." (*Id.*). More specifically, the treatment notes state that his headaches were less severe and less frequent. (Tr. 409, PAGEID #: 450). Even still, Dr. Chesnut ordered an MRI of Plaintiff's brain at that time. (Tr. 410, PAGEID #: 451). It was noted at this same appointment that Plaintiff was diagnosed with Type II diabetes. (*Id.*).

A November 5, 2013 MRI of Plaintiff's brain showed "no evidence of acute abnormality" but showed "minimal scattered T2/FLAIR white matter signal abnormality is nonspecific." (Tr. 446, PAGEID #: 487). Further, the MRI report stated there was no evidence of acute hemorrhage, mass, or infarct. (Tr. 447, PAGEID #: 489).

On February 27, 2014, Plaintiff saw Lisa Barringer, a nurse practitioner that worked with Dr. Chesnut, for a follow-up visit. Plaintiff reported that he was "doing well," that he experienced headaches only once a week, and was taking his diabetes medications as ordered. (Tr. 415, PAGEID #: 456).

Plaintiff underwent a psychological evaluation with Dr. Gary Sarver on March 25, 2014, at the request of the Division of Disability Determination. (Tr. 416, PAGEID #: 457). Although Plaintiff was being evaluated for his psychological functioning, he explained to Dr. Sarver that he cannot work because "I can't be on my feet for long, they really hurt." (*Id.*). Plaintiff explained that his last job was as a carpenter but he was laid off. (Tr. 418, PAGEID #: 459). Dr. Sarver noted that Plaintiff's "independent living skills appear[ed] to be adequate and he does participate in cooking, dishes, laundry, and shopping." (Tr. 416–17, PAGEID #: 457–58).

Plaintiff saw Ms. Barringer again on May 29, 2014, this time complaining of foot pain. (Tr. 423, PAGEID #: 464). Plaintiff explained that his feet were "hurting and burning" and it felt like he "ha[d] a stone bruise all the time and [he] can't stand on them." (Tr. 424, PAGEID #: 465). At the time, Plaintiff's diabetes medication compliance was noted as "poor," because he was not taking his Metformin as prescribed. (Tr. 425, 428, PAGEID #: 466, 469). A diabetic foot exam showed "abnormal monofilament exam bilaterally, callouses, feet with extreme generalized tenderness, [and] fungal nails." (Tr. 428, PAGEID #: 469). Ms. Barringer ordered an Electromyogram study ("EMG") and referred Plaintiff to podiatrist Dr. Vincent Nerone. (*Id.*).

Plaintiff underwent an EMG and Nerve Conduction Velocity Test ("NCV") on June 10, 2014. (Tr. 438, PAGEID #: 479). An evaluation of the left ulnar motor nerve showed decreased conduction velocity, but all remaining nerves "were within normal limits." (*Id.*). Further, all examined muscles showed no evidence of electrical instability. (*Id.*).

At a follow-up with Ms. Barringer on June 26, 2014, Plaintiff's medication compliance for his diabetes was listed as "excellent" (Tr. 431, PAGEID #: 472) but he reported that his blood sugars were still running high, although he forgot to bring his blood sugar log. (Tr. 433, PAGEID #: 474). Plaintiff reported having seen Dr. Nerone,[1] and Ms. Barringer recommended Plaintiff continue seeing him and prescribed a "low dose of Lyrica" for Plaintiff's neuropathy pain. (Tr. 429, 433, PAGEID #: 470, 474).

Upon referral by Ms. Barringer, Plaintiff had an MRI of his cervical spine on December 19, 2014, due to "posterior neck pain for 3 years [and] bilateral arm radiculopathy." (Tr. 461, PAGEID #: 502). The MRI showed small disc protrusions at multiple levels in the cervical spine, resulting in "mild to moderate central spinal canal stenosis at C5-C6, with a few additional

_____

[1] The medical record does not contain any treatment notes for Dr. Nerone.

levels of mild central spinal canal stenosis." (Tr. 462, PAGEID #: 503). There were "no levels of high-grade spinal canal stenosis or cord compression." (*Id.*). On January 30, 2015, Ms. Barringer wrote that Plaintiff was not to perform work for a period of three months, from January 30, 2015 through April 30, 2015, although it did not specify what ailment necessitated that Plaintiff stop working. (Tr. 466, PAGEID #: 507).

Plaintiff saw Ms. Barringer on April 17, 2015 for his diabetes, his diabetic neuropathy, and degenerative cervical disc issues. (Tr. 463, PAGEID #: 504). Treatment notes state that it was recommended that Plaintiff undergo a trigger point injection the following month. (Tr. 464, PAGEID #: 505). On July 8, 2015, Plaintiff again saw Ms. Barringer. (Tr. 466, PAGEID #: 517). Due to poorly copied treatment notes, Ms. Barringer's assessment is not clear, although she did recommend Lyrica and noted that Plaintiff had "chronic tinea pedis [Athlete's foot] on the plantar aspects of both feet" and "severe diabetic nerve pain." (Tr. 476, PAGEID #: 517). Further, Plaintiff reported numbness, tingling, and shooting pains in his feet. (Tr. 478, PAGEID #: 519).

On October 14, 2015, Plaintiff saw Dr. David Stroh for his cervical disc issues, headaches, diabetic neuropathy, and depression. (Tr. 574, PAGEID #: 615). Treatment notes state that Plaintiff reported that his prescribed Lyrica was "not much help." (*Id.*). Upon examination, Dr. Stroh noted Plaintiff's neck was tender in the right cervical region to light palpitation, his toenails were thickened with callous formation "over much of plantar surface with areas of erythema over much of this area," and were tender to light palpitation. (*Id.*). On that same date, Dr. David Stroh opined that "[d]ue to chronic medical conditions, [Plaintiff] is unable to work for the next 6 months." (Tr. 487, PAGEID #: 528).

Plaintiff saw Dr. Stroh again on November 18, 2015, still complaining of significant pain in his feet that he stated made it difficult for him to walk. (Tr. 489, PAGEID #: 530). Dr. Stroh noted that Plaintiff took Lamisil without problem. (*Id.*). An examination revealed Plaintiff's feet still had callus formation over the heels and balls of his feet, but he had less erythematous and "fair to good motion." (Tr. 490, PAGEID #: 531). At the time, Dr. Stroh referred Plaintiff to Podiatrist Dr. Earl Driggs for his tinea pedis. (*Id.*).

Plaintiff saw Dr. Driggs on December 29, 2015, for his Athlete's foot and the "burning and stabbing pain in the bottoms of feet." (Tr. 504, PAGEID #: 545). Dr. Driggs diagnosed Plaintiff with diabetic neuropathy and onychomycosis (a toenail fungus), for which he prescribed Lamisil therapy. (*Id.*). At an appointment on April 7, 2016, Dr. Driggs noted that Plaintiff finished his Lamisil and that his left big toe nail was growing down into the nail bed. (Tr. 501, PAGEID #: 542).

Plaintiff underwent another EMG and NCV test on March 2, 2016. (Tr. 511, PAGEID #: 552). The evaluation of the "Left Sural Anti-Sensory nerves showed normal distal peak latency, normal amplitude, and normal conduction velocity . . . Conduction studies in left peroneal and tibial nerves were also unremarkable . . ., but the patient jerked and kicked his leg violently, and the data was lost and could not be recovered." (*Id.*). It was noted that there was "no elector diagnostic evidence of generalized peripheral neuropathy," although the findings did "no exclude a small fiber, sensory generalized peripheral neuropathy and superimposed left lateral femoral cutaneous mononeuropathy[.]" (*Id.*).

From January 5, 2016 through April 12, 2016, Plaintiff was treated by Dr. Emmanuel Konstantakos and nurse practitioner Kimberly Spencer for right knee pain. (*See* Tr. 515–23,

PAGEID #: 556–64). Plaintiff described his knee pain as sharp, dull, aching, stabbing and constant, and was diagnosed with osteoarthritis. (Tr. 518, 520–21, PAGEID #: 559, 561–62; *see also* Tr. 578, PAGEID #: 619 (x-ray of right knee showed "mild osteoarthritis without fracture"). During that time, it was noted that Plaintiff had swelling (Tr. 526, PAGEID #: 567); mild tenderness on the medial side of the knee joint (Tr. 522, PAGEID #: 563); no instability (*id.*); and full strength on knee flexion (*id.*). Plaintiff had his knee drained (Tr. 521, PAGEID #: 562) and received a Cortisone injection (Tr. 523, PAGEID #: 564), which treatment notes indicate provided Plaintiff relief. (Tr. 515, PAGEID #: 556 (Plaintiff has "done well from" the shot)).

The record also includes a note authored by Ms. Spencer that Plaintiff was not able to work "due to current chronic medical state" for sixth months, from May 10, 2016 through November 10, 2016. (Tr. 537, PAGEID #: 578). No other information was provided with Ms. Spencer's note.

### D. State Agency Assessments

On April 2, 2014, state agency physician Dr. Diane Manos opined that Plaintiff could frequently lift twenty-five pounds, could stand or walk approximately six hours in an eight-hour workday, could sit approximately six hours in an eight-hour workday, and should avoid moderate exposure to noise due to hearing issues. (Tr. 121–22, PAGEID #: 162–63). Ultimately, Dr. Manos opined that Plaintiff could perform work at the medium level. (Tr. 123, PAGEID #: 164). State agency physician Dr. Malika Haque made identical findings at the reconsideration level on July 14, 2014. (Tr. 147–49, PAGEID #: 188–90).

### E. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security

Act through December 31, 2016, and had not engaged in substantial gainful activity since February 12, 2015. (Tr. 13, PAGEID #: 54). The ALJ further found that Plaintiff suffered from the following severe impairments: diabetic neuropathy, degenerative right knee, spine disorder, hearing disorder, and chronic headaches. (*Id.*).

Despite Plaintiff's impairments, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 15, PAGEID #: 56). In reaching that conclusion, the ALJ stated that Plaintiff had not demonstrated that his right knee issues or his spine disorder met or equaled any musculoskeletal listing, including 1.02 and 1.04 because, *inter alia*, he was able to ambulate effectively. (*Id.*). Additionally, the ALJ found that Plaintiff's diabetic neuropathy was best evaluated under Listing 11.14, which addresses peripheral neuropathies. (Tr. 16, PAGEID #: 57). The ALJ explained that Plaintiff failed to meet this Listing because there was no evidence of "significant and persistent disorganization of motor function in two extremities with the accompany limitations such that would satisfy the requirements of Listing 11.14." (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ held:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except only occasional balancing, kneeling, stooping, crouching, crawling and climbing of ramps and stairs but no climbing of ladders, ropes, or scaffolds. He must avoid hazards. He requires the ability to alternate between standing and sitting periodically equally during the day if desired. He must avoid even moderate exposure to noise, and because of headaches, he is limited to the performance of simple and repetitive tasks involving little or no change in work routine.

(*Id.*).

The ALJ noted that between November 25, 2013 and November 1, 2016, Plaintiff received "a variety of temporary restrictions during his treatment for his multiple medical

problems," but found that the restrictions were temporary and conclusory in nature, and "failed to provide functional limitations or a longitudinal perspective." (Tr. 17, PAGEID #: 58 (citing Ex. 9F/4, Ex. 13F/1, Ex. 22F/1–3, Ex. 24F/1)). Thus, although the ALJ explicitly stated that he gave "careful consideration" to these various restrictions, he assigned them "little weight," especially in light of the objective diagnostic testing showing only mild to moderate findings. (*Id.*).

The ALJ further opined that Plaintiff's "suggestion that he has been unable to perform a reduced range of light work [was] not consistent with the record." (Tr. 19, PAGEID #: 60). Specifically, the ALJ noted that Plaintiff's EMG and NCV showed no electrodiagnostic evidence of generalized peripheral neuropathy and a CT scan of Plaintiff's brain was unremarkable. (*Id.* (citing Ex. 19F/1 and Ex. 2F/14)). In addition, the ALJ opined that while diagnostic testing did reveal some significant findings, Plaintiff's clinical presentation was "largely within normal limits and revealed few and no more than minor functional deficits." (*Id.*). Indeed, the ALJ explained that Plaintiff lives alone and is independent in most of his activities of daily living. (*Id.*).

The ALJ also considered the state agency physician's opinions, explaining that "[t]he record supports the State Agency findings that the claimant does not meet or equal a Listing and that he is not disabled." (*Id.*). However, the ALJ rejected the state agency's opinions as to his physical impairments, explaining that Plaintiff's "multiple medical impairments" limit him to a range of light work, as opposed to medium work. (*Id.*).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III.    DISCUSSION

Plaintiff asserts three assignments of error:  (1) the ALJ's step five finding was inconsistent with the VE's testimony; (2) the ALJ's RFC did not account for the limitations imposed by Plaintiff's diabetic neuropathy; and (3) the ALJ erred in evaluating Plaintiff's subjective symptoms. (Doc. 13). The undersigned addresses each error in turn.

### A.  The VE's Testimony

Plaintiff first argues that the ALJ's RFC finding was "not consistent with the hypothetical posed to and considered by the VE at the hearing." (*Id.* at 6). Specifically, Plaintiff contends that the ALJ's restriction allowing him to alternate sitting and standing indicated an at-will sit-stand option—a restriction that was not posed in the ALJ's "controlling hypothetical to the VE."

(*Id.*). Thus, according to Plaintiff, the ALJ's finding at step five that there is sufficient work available in the national economy that Plaintiff can perform was not supported by substantial evidence. (*Id.* at 7–8).

At Step Five of the disability analysis, an ALJ must determine whether, in light of a claimant's RFC, age, education, and past work experience, that claimant can make an adjustment to other work. *Farley v. Colvin*, No. 1:15-CV-01282, 2016 WL 4543113, at *6 (N.D. Ohio Aug. 31, 2016) (citing 20 C.F.R. §§ 404.1520(a)(4)(v)). "At this step, the burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform." *Id.* (citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)). "To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs." *Id.* (citing *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987))). In order for a vocational expert's testimony to serve as substantial evidence in support of the conclusion that a plaintiff can perform other work, the hypothetical question posed by the ALJ must accurately portray all physical and mental impairments. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d at 239, 241 (6th Cir. 2002); *Kendrick v. Astrue*, 886 F. Supp. 2d 627, 638–39 (S.D. Ohio 2012) ("[T]he ALJ can rely on the VE's testimony, as long as the VE's testimony is in response to an accurate hypothetical of the claimant's physical and mental limitations").

During the hearing, the ALJ proposed a hypothetical in which an individual, *inter alia*, would "need to be able to alternate between a standing position and a seated position periodically during the course of the day, not necessarily at will, but as circumstances will allow, so by the

end of the day as desired, one could sit or stand equally in the aggregate." (Tr. 107, PAGEID #: 148). The VE testified that this hypothetical individual could work as a packager, a router, or an order caller, all of which had significant jobs in Ohio and the national economy. (*Id.*). The VE further testified that the packaging job would typically be done in the seated position, and the router and order caller jobs were best described as "50/50" between standing and sitting, meaning Plaintiff would need to sit fifty percent of the time and stand fifty percent of the time. (Tr. 108–09, PAGEID #: 149–50).

The ALJ's RFC ultimately directed that Plaintiff has "the ability to alternate between standing and sitting periodically equally during the day if desired." (Tr. 16, PAGEID #: 57). Contrary to Plaintiff's argument, this restriction is not an at-will sit and stand option; rather, it contemplates Plaintiff being able to move between sitting and standing *equally* (*i.e.* 50/50) during the day. This is the restriction that was conveyed to the VE in the hypothetical—that Plaintiff could sit and stand equally in the aggregate. *See Losh v. Comm'r of Soc. Sec.*, No. 5:15CV00980, 2016 WL 3668138, at *3 (N.D. Ohio July 11, 2016) ("Although 'the hypothetical question posed to a VE must accurately describe a claimant, there is no requirement that [the hypothetical] must match the language of the RFC verbatim.'") (quoting *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016)). Thus, the undersigned finds that the VE's testimony was in response to a hypothetical that accurately described Plaintiff's physical limitations as defined in the RFC, despite the ALJ not using the exact language in the hypothetical. *Kozlowski v. Comm'r of Soc. Sec.*, No. 11-CV-12213, 2012 WL 3472354, at *6 (E.D. Mich. Mar. 14, 2012), *adopted*, No. 11-12213, 2012 WL 3493036 (E.D. Mich. Aug. 14, 2012) (holding that "while the ALJ should have spoken more precisely," there was "no[t]

reversible error in the ALJ's reliance on VE testimony in response to hypotheticals" using similar, but not the exact language included in the RFC).

Consequently, the ALJ's finding at Step Five that a significant number of jobs exist in the national economy that Plaintiff could perform was appropriately based on the VE's testimony and was supported by substantial evidence.

### B. The ALJ's RFC Assessment

Plaintiff next argues that "the ALJ misunderstood and missed several pieces of probative evidence that supported a more limited RFC assessment." (Doc. 13 at 8). Plaintiff notes the following alleged errors: the ALJ erroneously mentioned Lamisil—an antifungal medication that was used to treat Plaintiff's Athlete's Foot—when discussing Plaintiff's diabetic foot pain (*id.*); the ALJ erroneously stated that Plaintiff's medications were helping his pain (*id.* at 9–10); the ALJ misunderstood the EMG and NCV results (*id.* at 9); and the ALJ did not adequately explain why a sit/stand option would sufficiently accommodate Plaintiff's diabetic neuropathy (*id.* at 11).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged

with evaluating several factors when determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

Here, the ALJ noted that at a doctor's appointment on November 18, 2015, Plaintiff "complained of significant pain in the feet, which makes it difficult to walk despite taking Lamisil without problem." (Tr. 18, PAGEID #: 59). Plaintiff explains that Lamisil is an antifungal medication being used to treat his Athlete's foot, not his diabetic foot pain, thus the ALJ erred in mentioning it. (Doc. 13 at 8). However, the medical record and Plaintiff's testimony reflect that Plaintiff's chronic Athlete's foot and toenail issues caused him significant pain. (*See, e.g.*, Tr. 476, 504, PAGEID #: 517, 545). Thus, the fact that the ALJ noted Plaintiff was taking Lamisil without problem does not mean that the ALJ misunderstood Plaintiff's diabetic neuropathy. To the contrary, the ALJ noted Plaintiff's neuropathy symptoms and diagnoses of diabetic neuropathy numerous times throughout the opinion. (Tr. 14, 17, 18, PAGEID #: 55, 58, 59). Thus, the fact that the ALJ discussed Lamisil does not indicate error.

The ALJ also stated that although [t]he medical evidence [was] somewhat sparse, [] the evidence support[ed] that claimant does have diabetic neuropathy, but medications help." (Tr. 19, PAGEID #: 60 (citing Ex. 11F/3)). The treatment records cited to are hard to decipher due to copying issues (*see* Tr. 476, PAGEID #: 517), but regardless, the ALJ also noted that Plaintiff felt the Neurontin he was taking was ineffective (Tr. 17, PAGEID #: 58). Thus, it is clear that

the ALJ understood Plaintiff's diabetic neuropathy and recognized that Plaintiff did not feel some medications were helping.

In terms of the EMG and NCV findings, Plaintiff's argument is not entirely clear:

> [T]he ALJ recited *three* times in his decision that the EMG and NCV could not exclude the types of neuropathy that were "suggested by the claimant's presenting history" (Tr. 14, 18, 19), yet somehow concluded that "[w]hile diagnostic testing does reveal some significant findings…these must correlate with clinical examination [and] [i]n the present case, the claimant's presentation is largely within normal limits and reveals few and no more than minor functional deficits." (Tr. 19). The ALJ's conclusion reflects two errors of thought: (1) The ALJ did not understand that the EMG and NCV studies correlated with Sullivan's "presenting history," and (2) in order for the EMG and NCV studies to correlate with Sullivan's "presenting history," there had to be clinical examination findings available for comparison. In fact, as noted above, at step two in his decision, the ALJ had cited to the July 8, 2015 clinical examination findings of Sullivan's podiatrist (Tr. 17-18, citing Tr. 477). What's more, in this same treatment note cited by the ALJ, Sullivan's podiatrist specifically stated, "Full exam was performed today. Objective findings reveal severe diabetic peripheral…" (Tr. 476). Thus, the ALJ's assertions that Sullivan's "suggestion that he has been unable to perform a reduced range of light work is not consistent with the record," and that Sullivan's objective evidence did not correlate with his clinical examination findings are not supported by the administrative record.

(Doc. 13 at 9). Plaintiff seems to argue that the EMG and NCV studies support a more restrictive RFC. However, the March 2, 2016 EMG and NCV results were "unremarkable" and largely inconclusive because Plaintiff "jerked and kicked his leg violently" causing all data to be lost. (Tr. 511, PAGEID #: 552). It is true that the report stated the findings could not exclude neuropathy, but that in and of itself does not support a more restrictive RFC.

Finally, Plaintiff argues that "it is questionable why the ALJ chose a sit/stand option instead of limiting [him] to a sedentary exertional level." (Doc. 13 at 11). Plaintiff fails to cite to a single medical opinion, however, that indicates Plaintiff should be limited to a sedentary exertional level. In fact, no medical professional opined as to *any* functional limitations Plaintiff

experienced due to his impairments besides the state agency consultants, who stated Plaintiff could work at the medium level. Plaintiff's own testimony provides only vague descriptions of pain with no specifics on any functional limitations. Thus, although Plaintiff is arguing for a more restrictive RFC, it was within the ALJ's purview to make a determination about Plaintiff's RFC based on the record as a whole. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (noting that "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference"). Taking all of the above into account, the undersigned finds that substantial evidence supports the ALJ's conclusions.

### C. Evaluation of Plaintiff's Statements Regarding His Limitations

Finally, Plaintiff argues that the ALJ did not properly evaluate his credibility, because he "failed to explain how the evidence undermined [Plaintiff's] allegations." (Doc. 13 at 13). Plaintiff argues that the ALJ misunderstood or ignored evidence that corroborated Plaintiff's statements about the intensity, persistence, and resulting limitations from his diabetic nerve pain. (*Id.*).

It is well established that the "subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record." *E.g.*, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citations omitted). "Nevertheless, an ALJ is not *required* to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* (citations omitted). Recently enacted, SSR 16-3p eliminated the use of the term "credibility" and clarified that an ALJ should consider whether the claimant's statements about the intensity,

persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record. 2016 WL 1119029 at *7.

Here, the ALJ noted that Plaintiff lives alone and is independent in his activities of daily living. (Tr. 19, PAGEID #: 60). For example, the ALJ relied on the fact that Plaintiff is able to "take[] care of his hygiene, drive[], do[] his laundry, and perform[] some household cleaning and dish washing." (*Id.*). Further, Plaintiff reported on a July 8, 2015 medical history form that he routinely exercised. (Tr. 541, PAGEID #: 582). Thus, it was reasonable for the ALJ to find that Plaintiff's daily activities were inconsistent with Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms. *See, e.g.*, *Moses v. Comm'r of Soc. Sec.*, 402 F. App'x 43, 47 (6th Cir. 2010) (claimant's assertions of disabling pain undermined by her testimony that, with help, she sometimes washed dishes, went grocery shopping, dusted, washed laundry, and drove about three miles once a week).

The ALJ also found that clinical evidence was not consistent with debilitating symptoms. For example, a physical examination of Plaintiff's right knee revealed only mild tenderness, no instability, and almost full extension. (Tr. 19, PAGEID #: 60 (citing Ex. 20F/9)). Additionally, the ALJ relied on the fact that Plaintiff's EMG and NCV showed no evidence of generalized peripheral neuropathy. (*Id.* (citing Ex. 19F/1)). Further, the ALJ noted Plaintiff's CT scan of the brain was unremarkable. (*Id.* (Ex. 2F/14)).

Plaintiff argues that the ALJ's reliance on the CT scan amounted to a mischaracterization of the evidence because the ALJ did not mention an MRI of Plaintiff's brain conducted three months later. (Doc. 13 at 13–14). This "omission," according to Plaintiff, is "suspect and undermines the integrity of his entire decision." (*Id.* at 14). While the MRI was omitted from

the ALJ's decision, an ALJ is not required to discuss every piece of evidence in the record. *See Morgan v. Comm'r of Soc. Sec.*, No. CV 15-12988, 2016 WL 5402940, at *4 (E.D. Mich. July 15, 2016), *adopted*, No. 15-12988, 2016 WL 5369616 (E.D. Mich. Sept. 26, 2016) ("There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted)). Moreover, Plaintiff does not allege that his headaches should qualify as a medically determinable impairment and he doesn't provide any functional limitations that result from his headaches. *See Maddin v. Astrue*, No. CIV.A. 10-259-GWU, 2011 WL 3104076, at *3 (E.D. Ky. July 26, 2011) (holding that "the mere diagnosis of [] [migraines] says nothing about its severity under the regulations, and it is still the plaintiff's burden to show functional limitations resulting from the condition") (citing *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988)). Thus, contrary to Plaintiff's argument, the ALJ's decision to not discuss the MRI does not undermine the opinion, nor does it take away from his analysis of Plaintiff's subjective complaints.

At base, the Sixth Circuit has held that courts must accord great deference to an ALJ's "credibility" assessment, particularly "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *Buxton*, 246 F.3d at 773 (citations omitted). To that end, it is not the province of the reviewing court to "try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In this case, the ALJ set forth the various factors that he considered in his credibility assessment, including specific citations to medical records, objective

clinical findings, and Plaintiff's daily activities, and the ALJ's determination has support in the record.  (*See* Tr. 15–20, PAGEID #: 56–61).  Consequently, the ALJ complied with the regulations, and his decision is supported by substantial evidence.

## IV.    CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 13) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date:  June 22, 2018

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE